UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| ALVA FUNK, | |
| Petitioner, | |
| v. | CASE NO.: 3:24-CV-1001-HAB-ALT |
| WARDEN, | |
| Respondent. | |

## OPINION AND ORDER

Alva Funk, a prisoner without a lawyer, filed a habeas corpus petition challenging his 2015 conviction in Grant County under case number 27D01-1305-FC-00016 for robbery and habitual offender adjudication. (ECF No. 1). For the reasons stated below, the petition will be denied.

### I.   BACKGROUND

The Indiana Court of Appeals set forth the facts underlying Funk's conviction as follows:[1]

On April 5, 2013, at around 11:00 A.M., an elderly looking man walked into a branch of STAR Financial Bank in Marion. He wore large, loose-fitting coveralls, a light-colored ball cap, and was barehanded. As he passed through the bank's vestibule and inner doors, one of the bank tellers then working noticed that the "elderly" man was wearing a mask in the form of an old man's face. The teller concluded she was about to be robbed.

The masked man approached the teller's window and handed her a note with instructions to the following effect: "Do not trigger an alarm"; "give me your one hundreds, fifties, and twenties from [your] lower drawer and [your] top drawer"; "[I have] a weapon." As the teller read the note, the man twice reached his right hand into the breast of his coveralls and then kept it there, hidden from the teller, until she complied. The teller handed the man all the money in her drawers. The man stuffed the money, almost $8,000, into a Burger King paper bag, along with the note, and walked to the front doors. Near the doors, the man accidentally dropped a small, black piece of plastic on the ground. He then left through the front doors as he had entered.

---

[1] In a habeas case, the facts set forth by the state court are presumed to be correct unless the petitioner rebuts this presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The bank's surveillance cameras did not capture how the man arrived at, or departed from, the bank. In the minutes after the robbery, however, the surveillance cameras of a Walmart store down a side road from the bank captured footage of a small, black car traveling "relatively quickly" away from the bank.

Police soon arrived at the bank and began investigating. The dropped piece of plastic was recovered and submitted to the forensic scientists at the Indiana State Police lab in Indianapolis for DNA testing. The testing returned one complete, single-source DNA profile. That profile was checked against CODIS, the national index of DNA profiles maintained by the U.S. Department of Justice, where the profile was found to match that of a convicted felon currently on parole from a 1993 conviction for intimidation, resisting law enforcement, and criminal recklessness: Alva Funk of Lafayette, Indiana . . . .

On the basis of that match, and on the basis of other fruits of ongoing investigations into three other bank robberies committed under similar circumstances by similar means, including one in Marion in January 2013 ("the January robbery"), the Marion Police Department sought a search warrant from Judge Jeffrey Todd of Grant Superior Court for the home of Funk's sister and niece in Lafayette, where Funk was known to be living ("the Lafayette house"). The warrant was issued for the search and seizure of the following items:

> Old man style Halloween mask, green baseball style hat, dark colored baseball style hat, blue zipper style hooded sweatshirt, black shoulder strap bag, firearm or air-soft style handgun, ammunition, U.S. Currency, U.S. Currency that is marked bait money, two tone with inner lining dark zipper sweatshirt, 3x5 style index card bank robbery note, blue style baseball hat, gray or blue scarf, greenish colored zip up jacket with gray lining, blue jean pants, blue LEVI style baseball hat, boots, white tennis shoes, white or light color style beach hat, hair wigs, navy blue mechanic style jumpsuit overhauls [sic] with zipper, Burger King sack or bag, bank dye-pack and/or red stains, DNA standard and Major Case Finger/Palm Prints of Alva Oliver Funk . . . . .

With the help of the Lafayette Police Department, the Marion Police Department executed the search warrant for the Lafayette house on April 26, 2013. Just as officers were preparing to enter the house, Funk was observed driving away from it. Some distance away from the house, Funk was pulled over, arrested, and taken to a Lafayette police station for questioning. A swab of Funk's cheek was taken for the purposes of further DNA testing, and his cell phone was seized and examined.

Back at the house, officers executed the search warrant in Funk's absence. Their search focused on an upstairs loft bedroom that Funk used as his own, as well as on a shared garage stocked with tools and other material, which Funk's grandnephew used as a base for his local construction business. Under the warrant, police

2

recovered inter alia a set of dark-colored coveralls, a light-colored ball cap, a Burger King bag, and, from underneath Funk's mattress, a box of .38 Special ammunition with five rounds missing. From a detective of the Marion Police Department, the jury heard that this type of ammunition is "typically . . . associated" with a five- or six-round revolver.

In the course of their search, officers discovered what they believed to be incriminating items beyond those particularly described in the warrant. Wishing to seize those items as well, on-scene officers called the lead investigator and asked for direction. The lead investigator in turn called Judge Todd to ask for an "extension" of the search warrant to authorize seizure of the newly discovered items. . . .

Judge Todd granted the investigators' request to extend the scope of the original search warrant. The second, "expanded" warrant does not appear in the record, nor does the search warrant return listing all the items eventually seized. However, the expanded warrant apparently authorized seizure of the following items: a handheld radio frequency scanner, a device described as a "cell phone jammer" inside a blue metal case, a laptop computer, a Chase Bank brochure with handwritten notes, and pieces of torn-up paper with handwritten notes. The pieces of torn-up paper were recovered from the bottom of a trashcan in the loft bedroom and pieced back together by on-scene officers as they searched for the robbery note. The torn-up pieces appeared to comprise two checklists: "note, glue ✓, mask ... ✓, ... bag ✓, gun ✓" and "jacket ✓, sweats, scanners ✓, . . . coveralls, cosmetic bag, jammer."

A third set of items was seized without judicial authorization under either the original or the "expanded" warrant. This included a black t-shirt, a white tank top, white socks, two black plastic clips not otherwise identified, black sweatpants, a red knotted kerchief, an account statement from First Merchants Bank, a device purporting to be a "hidden camera locator," a savings account ledger from Lafayette Bank and Trust, Knight's Inn stationary with handwritten dollar figures in the thousands, a Knight's Inn room card, several prepaid gift cards, a Faraday bag for shielding electronics from radio frequencies, a car rental agreement from a Hertz rental car agency in Lafayette, a gray satchel containing an atlas of Indiana, and a blue satchel containing makeup and double-sided tape.

The rental agreement was for the rental of a Mazda 2 for a period covering the April robbery. The small, black Mazda appeared similar to the small, black car recorded speeding away from the robbery scene by Walmart surveillance cameras. A detective of the Marion Police Department, Robin Young, had viewed the Walmart footage on the day of the robbery and was at the Lafayette house while the search warrant was executed.

On its cover, the atlas of Indiana promised "Detailed Topographic Maps" showing "Back Roads" and "GPS Grids." The atlas was found to have four consecutive

3

> pages torn out of it. Those pages, according to the atlas's index, featured maps of Lafayette, Marion, and surrounds.
>
> The day after the search warrant was executed, April 27, 2013, Judge Todd issued an arrest warrant for Funk on the basis of the fruits of the search disclosed at a probable cause hearing. Funk was still in the custody of the Lafayette police following his arrest the previous day. Funk was thereafter remanded to the custody of the Marion police and transported to Grant County.

*Funk v. State*, 69 N.E.3d 957 (Table), 2016 WL 7493403, at *1–3 (Ind. Ct. App. 2016) (headnotes, footnotes, and internal citations omitted).

Funk was charged with two counts of robbery, one for the January 2013 robbery and the other for the April 2013 robbery. *Id.* at *3. He was also charged with being a habitual offender based on his prior criminal record. *Id.* He filed three separate motions to suppress evidence before trial, all of which were denied. *Id.* at *3–4. Following a jury trial, the jury found Funk not guilty of the January 2013 robbery, but found him guilty of the April 2013 robbery. *Id.* at *5. The jury further found that he was a habitual offender due to his prior convictions. *Id.* He was sentenced to an aggregate term of 50 years in prison. *Id.*

On direct appeal, Funk challenged the admission of certain evidence, argued that the evidence was insufficient to support his conviction, and argued that the prosecutor committed misconduct during closing arguments. *Id.* The Indiana Court of Appeals rejected these arguments and affirmed Funk's conviction. *Id.* at *6–12. He sought transfer to the Indiana Supreme Court, but the petition was denied. *Funk v. State*, 83 N.E.3d 1218 (Table) (Ind. 2017).

In July 2017, Funk filed a petition for state post-conviction relief raising claims of ineffective assistance by trial and appellate counsel. *Funk v. State*, 239 N.E.3d 32 (Table), 2024 WL 2829583, at *3 (Ind. Ct. App. 2024). The public defender filed an appearance on Funk's

4

behalf, but was later granted leave to withdraw pursuant to Indiana Post-Conviction Rule 1(9)(C).[2] (ECF No. 8-9, at 2). After counsel withdrew, Funk represented himself in the post-conviction case. (*Id.* at 3–27.) Funk moved for a change of judge pursuant to Indiana Post-Conviction Rule 4(b) but was denied. *Id.* An evidentiary hearing was then held at which Funk presented testimony from his trial and appellate attorneys. *Funk*, 2024 WL 2829583, at *3. His petition was ultimately denied. *Id.*

He appealed, asserting claims of ineffective assistance of counsel and errors by the post-conviction judge. *Id.* The Indiana Court of Appeals concluded that "most of Funk's arguments are based on a misunderstanding of the record and/or the law and lack both evidentiary support and cogency." *Id.* at *4. The court found his arguments to be waived and/or unavailing under applicable law, and affirmed the denial of post-conviction relief. *Id.* at *4–8. He sought transfer to the Indiana Supreme Court, but his petition was denied. *Funk v. State*, 245 N.E.3d 1019 (Ind. 2024).

Funk has now turned to federal court. He raises the following claims:[3] (1) the state waived any objection to his post-conviction petition by failing to defend in the post-conviction proceeding; (2) trial counsel was ineffective in failing to have the piece of plastic recovered from the bank excluded as evidence; (3) trial counsel was ineffective in not calling forensic expert Linda Wiegman as a witness; (4) trial counsel was ineffective in not challenging his warrantless arrest; (5) trial counsel was ineffective in failing to object to an alleged omission in the probable cause

---

[2] That Rule permits counsel to withdraw if counsel determines after investigation that "the proceeding is not meritorious." IND. POST.-CONV. R. 1(9)(C).

[3] Funk articulates his grounds for relief in a confusing fashion. For each claim he includes boilerplate language asserting violations of the "Fourth, Sixth, and the Fourteenth Amendments of the U.S. Constitution and Article One, Sections 11, 12, and 13 of the Indiana Constitution," regardless of the nature of his claim. (ECF No. 1, at 3–7). The court has attempted to give the petition liberal construction and to discern the source of law underlying each of his claims. He also lists three claims as "ground four" and omits any ground five. (*Id.*) The court has renumbered the claims sequentially for ease of reference.

5

affidavit used to obtain an arrest warrant; (6) trial counsel was ineffective in not challenging the cheek swab and search of his residence; (7) trial counsel was ineffective in failing to request a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978); and (8) his rights were violated when the post-conviction judge failed to recuse himself. (ECF No. 1, at 3–7).

In response to the petition, Respondent argues that Funk's claims are not cognizable, procedurally defaulted, and/or without merit under governing standards. (ECF No. 8). Funk filed a traverse in support of his petition, (ECF No. 23), and also filed a "Motion to Stay Proceedings" (ECF No. 20). Respondent replied to Funk's stay motion by arguing that a stay of the case is not warranted. (ECF No. 25). The matter is now ripe for adjudication.

## II. ANALYSIS

Funk's petition is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which allows a district court to issue a writ of habeas corpus "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Habeas corpus was intended as a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Gilbreath v. Winkleski*, 21 F.4th 965, 981 (7th Cir. 2021) (citation and internal quotation marks omitted). The court can grant an application for habeas relief only if it meets the stringent requirements of 28 U.S.C. § 2254(d), set forth as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

6

This standard is "difficult to meet" and "highly deferential." *Hoglund v. Neal*, 959 F.3d 819, 832 (7th Cir. 2020) (citation omitted). "It is not enough for a petitioner to show the state court's application of federal law was incorrect; rather, he must show the application was unreasonable, which is a 'substantially higher threshold.'" *Id.* (citation omitted). In effect, "[a] petitioner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Id.* (citation omitted).

Funk first claims that the state waived its right to object to his request for post-conviction relief by failing to defend in state court. (ECF No. 1, at 3; ECF No. 23-1, at 5–6.) His argument is somewhat difficult to decipher, but in state court he argued that he was entitled to a default judgment because the State did not file a response to his post-conviction in accordance with Indiana Post-Conviction Rule 4(a) or comply with other state procedural rules.[4] (ECF No. 9-11, at 230–31). The post-conviction court denied the motion. (*Id.* at 232). And on appeal, the Indiana Court of Appeals concluded that Funk did not show any error under Indiana law. *Funk,* 2024 WL 2829583, at *3 n.2. A claim based on a violation of state law is not cognizable on federal habeas corpus review.[5] *Estelle v. McGuire*, 502 U.S. 62, 67 (1991); *see also Resendez v. Smith*, 692 F.3d 623, 628 (7th Cir. 2012) ("that the State may have failed to comply with its post-conviction procedures would not raise a cognizable federal habeas claim").

---

[4] If Funk is suggesting that the state was wholly absent from the post-conviction proceedings, that is factually inaccurate, because the prosecutor actively participated in the evidentiary hearing. (*See* ECF Nos. 9-17, 8-9). It was Funk's obligation under Indiana law to prove an entitlement to post-conviction relief, not the state's burden to prove that relief should be denied. *See* IND. POST.-CONV. R. 1(5); *Wilkerson v. State*, 728 N.E.2d 239, 243 (Ind. Ct. App. 2000).

[5] Funk sprinkles citations to Indiana law throughout his petition and traverse. (*See* ECF No. 1, at 3–7; ECF No. 23, at 1–40). To the extent any of his other claims are premised on violations of Indiana law, they are not cognizable in this proceeding. *Estelle*, 502 U.S. at 67.

Funk references the Fourth and Sixth Amendments within this claim but does not make a cogent argument about how his rights were violated. Neither of these Amendments addresses the procedures that must be used by a state in a post-conviction proceeding. In fact, a state has no obligation to provide any avenue for post-conviction relief. *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987). He may be trying to argue that his right to counsel was violated in the post-conviction proceeding when the public defender withdrew, but he had no constitutional right to counsel in the post-conviction proceeding. *Id.* at 555 ("the right to appointed counsel extends to the first appeal of right, and no further"). AEDPA also expressly precludes errors by counsel in a post-conviction proceeding as a ground for habeas relief. 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during . . . [s]tate collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."). Funk has not established an entitlement to federal habeas relief in connection with this claim.

Claims two through seven are interrelated and all relate to the performance of Funk's trial counsel. Funk was represented by public defender Bruce Elliott during the bulk of the pretrial proceedings, including one of his motions to suppress. *Funk*, 2024 WL 2829583, at *2. Attorney Elliott withdrew in June 2015 when Funk retained attorney Gregory Spencer to represent him. *Id.* Attorney Spencer completed pretrial preparations, filed two more motions to suppress, and represented Funk at the four-day jury trial held in November 2015. *Id.* Funk refers to these attorneys interchangeably in his petition and traverse, and so the court considers both of their actions in connection with the failings he points to.

To prevail on a claim of ineffective assistance, the petitioner must show that counsel's performance was deficient and that the deficiency prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). On the deficiency prong, the central question is "whether an attorney's

8

representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices[.]" *Harrington v. Richter*, 562 U.S. 86, 105 (2011). An attorney's representation "need not be perfect, indeed not even very good, to be constitutionally adequate." *Delatorre v. United States*, 847 F.3d 837, 845 (7th Cir. 2017). Instead, the petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Gilbreath*, 21 F.4th at 981.

The court's review of counsel's performance in a habeas case is highly deferential: "[T]he question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105. The court also must avoid the benefit of hindsight and respect its "limited role in determining whether there was manifest deficiency in light of information then available to counsel." *Premo v. Moore*, 562 U.S. 115, 125 (2011). "[C]ourts must defer to any strategic decision the lawyer made that falls within the wide range of reasonable professional assistance, even if that strategy was ultimately unsuccessful." *Shaw v. Wilson*, 721 F.3d 908, 914 (7th Cir. 2013).

On the prejudice prong, the petitioner must show there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Gilbreath*, 21 F.4th at 981 (citation omitted). In assessing prejudice under *Strickland*, "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel had acted differently." *Harrington*, 562 U.S. at 111. "The likelihood of a different result must be substantial, not just conceivable." *Id*. at 112.

Although an isolated error can in some cases amount to ineffective assistance, "it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *Karr v. Sevier*, 29 F.4th 873, 880 (7th Cir. 2022). If the defendant wanted counsel to make an argument that had no merit, an ineffective-assistance claim cannot succeed because "[c]ounsel is not ineffective for failing to raise meritless claims." *Warren v. Baenen*, 712 F.3d 1090, 1104 (7th Cir. 2013); *see also Stone v. Farley*, 86 F.3d 712, 717 (7th Cir. 1996) ("Failure to raise a losing argument, whether at trial or on appeal, does not constitute ineffective assistance of counsel.").

Funk first argues that his trial attorneys were ineffective in failing to have the piece of plastic containing his DNA excluded as evidence. (ECF No. 1, at 4). Before considering the merits of a claim contained in a habeas petition, the Court must ensure that the petitioner exhausted all available remedies in state court with respect to that claim. 28 U.S.C. § 2254(b)(1)(A); *Hoglund*, 959 F.3d at 832. The exhaustion requirement is premised on a recognition that the state courts must be given the first opportunity to address and correct violations of their prisoners' federal constitutional rights. *Davila v. Davis*, 582 U.S. 521, 528 (2017); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). For that opportunity to be meaningful, the petitioner must fairly present his constitutional claim in one complete round of state review, including seeking discretionary review in the state court of last resort. *Baldwin v. Reese*, 541 U.S. 27, 30–31 (2004); *Boerckel*, 526 U.S. at 845. The companion procedural default doctrine, also rooted in comity concerns, precludes a federal court from reaching the merits of a claim when the claim was presented to the state courts and denied on the basis of an adequate and independent state procedural ground, or when the claim was not presented to the state courts and the time for doing so has passed. *Davila*, 582 U.S. at 528; *Coleman v. Thompson*, 501 U.S. 722, 735 (1991).

Funk raised this claim on post-conviction review, but the Indiana Court of Appeals determined that it was inadequately developed and therefore waived. *Funk*, 2024 WL 2829583, at *4. The finding of waiver constitutes an adequate and independent state procedural ground that bars federal habeas review. *Kaczmarek v. Rednour*, 627 F.3d 586, 591 (7th Cir. 2010) ("[W]hen a state court refuses to reach the merits of a petitioner's federal claims because they were not raised in accord with the state's procedural rules . . . that decision rests on independent and adequate state procedural grounds.").

Assuming Funk could overcome the default, he has not established ineffective assistance of counsel. As the Indiana Court of Appeals observed in finding the claim waived, Funk "baldly asserts that 'other people's DNA' was on the piece of plastic and that the manner in which the detective collected the piece 'destroyed' or 'removed' that DNA." *Funk*, 2024 WL 2829583, at *4 (citation and internal alterations omitted). Here, too, Funk asserts that the "piece of plastic entered into evidence had been compromised" and was "contaminated." (ECF No. 1, at 4). He does not cite to any record evidence in support of this assertion, and his own conjecture is not enough to warrant federal habeas relief. *See* 28 U.S.C. § 2254(e)(2); *Woodson v. Mlodzik*, 129 F.4th 1036, 1041 (7th Cir. 2025) (federal habeas courts are not meant to be "an alternative forum for trying facts and issues," and the Court's review is limited to "the evidence presented in the State court proceeding").

Contrary to Funk's suggestion, the record reflects that Funk's attorneys capably handled the DNA evidence. Counsel first tried to keep the DNA evidence out of the record by moving to suppress the results of his cheek swab by challenging the circumstances surrounding his arrest. *Funk,* 2016 WL 7493403, at *4. This motion was unsuccessful because the trial court found nothing improper about Funk's warrantless arrest, which occurred in a public place and was

11

supported by probable cause. *Id.* Further, the court found the cheek swab was properly taken pursuant to the search warrant issued before Funk's arrest, which was based on the CODIS match, among other evidence. *Id.*

Funk has not cogently explained what counsel could have done to overcome these findings. He appears to be under a misconception that his arrest was improper—and that all the evidence obtained thereafter should have been suppressed as fruits of the poisonous tree—because police did not have a warrant when they arrested him.[6] This claim has no traction, because "it is a settled rule that warrantless arrests in public places are valid." *Collins v. Virginia*, 584 U.S. 586, 595 (2018); *Gerstein v. Pugh*, 420 U.S. 103, 113–14 (1975) ("[A] policeman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of crime, and for a brief period of detention to take the administrative steps incident to arrest."). An arrest in a public place still must be supported by probable cause, but there was ample cause to believe Funk had committed a crime based on the CODIS match and other evidence linking him to a series of robberies. *See Dollard v. Whisenand*, 946 F.3d 342, 353–54 (7th Cir. 2019) ("Probable cause exists to arrest a suspect if at the time of arrest the facts and circumstances . . . would warrant a prudent person in believing that the suspect had committed or was committing an offense.").

Although counsel's efforts to suppress this evidence were unsuccessful, counsel further attempted to undercut the DNA evidence at trial by suggesting to the jury that Funk's DNA could have gotten on the plastic even if he was not the bank robber. Detective Brian Sharp, who collected this evidence, testified about his training as a crime scene investigator and explained in detail how

---

[6] Funk was arrested on April 26, 2015, as he was driving away from the Lafayette house. In *Gerstein v. Pugh*, 420 U.S. 103 (1975), the Supreme Court held that the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention following a warrantless arrest. In Funk's case, a probable cause hearing was conducted the day after his arrest. *Funk,* 2016 WL 7493403, at *4.

12

he collected the evidence and swabbed it for DNA. (ECF No. 9-5, at 109–25). On cross-examination, Funk's counsel asked Detective Sharp questions aimed at showing that Funk's DNA could have ended up on the plastic through secondary transfer. (*Id.* at 121–29). Counsel bolstered this idea when he cross-examined the state's DNA analyst, getting her to admit that secondary transfer of Funk's DNA was possible through various means and that she did not know how Funk's DNA came to be on the plastic. (ECF No. 9-6, at 130–40, 142–43). Counsel returned to that same theme during closing arguments, emphasizing to the jury that the DNA evidence did not prove that Funk was the bank robber or had actually handled the plastic piece. (ECF No. 9-7, at 177–83).

The record thus reflects that Funk's attorneys made a significant, tangible effort to undercut this evidence. Funk's regret that this damaging evidence was used against him does not establish ineffective assistance. He has not demonstrated that counsel's efforts amounted to incompetence under professional norms. Nor has he shown that there is a reasonable likelihood that the result of the proceeding would have been different if counsel had taken some additional step with respect to this evidence.

Funk relatedly claims that his counsel was ineffective in not calling Linda Wiegman, the forensic scientist who performed the CODIS match, as a witness at trial. The state court reasonably concluded that Funk did not establish ineffective assistance on this ground under *Strickland*. *Funk*, 2024 WL 2829583, at *5. As outlined above, Wiegman prepared a certificate of analysis during the police investigation indicating that the DNA profile found on the piece of plastic left behind at the bank was consistent with Funk's DNA profile maintained in the CODIS database. *Funk*, 2024 WL 2829583, at *5. The prosecution did not call Wiegman as a witness at Funk's trial or present her certificate of analysis as evidence. (ECF No. 9-11, at 56). Her certificate was merely used as partial foundation for the warrant to obtain a cheek swab from Funk. (*Id.*) Indeed, her certificate

13

indicated that she only made a preliminary analysis of the DNA evidence to "inform [police] of a potential investigative lead." (ECF No. 9-1, at 207–08).

At trial, the prosecution presented testimony from forensic scientist Stacy Bozinovski, who tested the plastic recovered from the bank for DNA and then compared that profile to the profile from Funk's cheek swab, finding it to be a match. (ECF No. 9-6, at 112–30). Funk's counsel prepared for her testimony by subpoenaing her notes and deposing her before trial. (ECF No. 9-1, at 186, 190, 196). Counsel also filed a motion seeking independent testing by a private laboratory to confirm or refute her results.[7] (*Id.* at 201–03; ECF No. 9-4, at 100–05). Further, counsel thoroughly cross-examined Analyst Bozinovski at trial to undercut the incriminating effect of her DNA comparison. As stated above, he was able to elicit testimony from her about the possibility of secondary transfer of Funk's DNA onto the plastic to try to create reasonable doubt. (ECF No. 9-6, at 130–40, 142–43).

Funk's "preoccupation" with Wiegman appears related to the statement in her certificate that "fingerprint confirmation of the offender's identity" was unavailable. *Funk,* 2024 WL 2829583, at *4 n.3. Funk appears to believe her statement meant "there was something wrong with the CODIS hit." *Id.* However, as the state court reasonably concluded, "all this meant was that fingerprints were not available to confirm [Funk's] identity at the time of the analysis." *Id.* Nothing in Wiegman's statement undercut the validity of the DNA analysis conducted by Bozinovski. As Funk's counsel put it at the post-conviction hearing, Wiegman was effectively "out of the picture" once the state submitted an actual DNA sample from Funk to Bozinovski for comparison. (ECF No. 9-17, at 97). Indeed, had Wiegman taken the stand, it could have opened the door to damaging

---

[7] The motion was granted, (ECF No. 9-4, at 32), but Funk's counsel later indicated that the defense would not pursue additional DNA testing. (ECF No. 9-2, at 46). No doubt there were risks with pursuing this course, because it would be damaging to the defense if an independent expert reached the same conclusion as Bozinovski.

14

evidence about the police investigation or the reasons why Funk's DNA was in the DOJ database. It would have also alerted the jury that another forensic expert had determined, at least preliminarily, that Funk's DNA was on the plastic. Thus, he has not established ineffective assistance in connection with Wiegman.

Funk also maintains that counsel was ineffective in challenging his arrest and the warrants issued in the case.[8] (ECF No. 1, at 5–6). The state court found some of these claims waived as inadequately developed, but otherwise applied *Strickland* to reject them. *Funk*, 2024 WL 2829583, at *5. Waiver amounts to a state procedural bar that would preclude habeas relief, but even if Funk could overcome the bar, the state court's rejection of his claims was reasonable under the facts of the case.

Contrary to Funk's suggestion, the record reflects that his attorneys made extensive efforts to challenge his arrest and to keep inculpatory evidence from the jury. As stated above, they filed three separate motions to suppress: (1) a motion to suppress evidence recovered from the Lafayette house and on Funk's cell phone due to lack of probable cause supporting his arrest, staleness of the facts underlying the probable cause affidavit, and the officers' alleged improper expansion of the search warrant; (2) a motion to suppress Funk's DNA sample because his arrest was unlawful; and (3) a motion to suppress evidence obtained from the Lafayette house due to an alleged falsehood in the probable cause affidavit. *Funk*, 2016 WL 7493403, at *3-4.

---

[8] Given the way Funk has drafted his petition, it is unclear if he is trying to assert free-standing Fourth Amendment claims within these claims. The Fourth Amendment has limited application on habeas review, because the exclusionary rule is not a personal right of the accused but rather a judicially created means of deterring police misconduct. *Stone v. Powell*, 428 U.S. 465, 490 (1976); *Brock v. United States*, 573 F.3d 497, 499 (7th Cir. 2009). Furthermore, the only free-standing Fourth Amendment claim Funk exhausted in the state proceedings was a claim related to the recovery of the car rental agreement, the gray satchel containing the atlas, and the blue satchel containing makeup and tape, which he argued fell outside the scope of the warrant. *Funk*, 2016 WL 7493403, at *5–9. The Indiana Court of Appeals determined on direct appeal that this evidence was admissible under the plain view doctrine. *Id*. Funk does not make a cogent argument challenging that holding.

Although these motions were not successful, Funk's counsel also took steps to preserve these issues for appeal. (ECF No. 9-2, at 136–37). Counsel then took additional steps at trial to try to refute or undercut this evidence. Counsel's efforts to undercut the DNA evidence have already been recounted in detail. Likewise, counsel tried to temper the effect of evidence taken from the Lafayette house by presenting testimony from Funk's grandnephew, who claimed that some of these items seized by police belonged to him. (ECF No. 9-7, at 94–132).

Funk's argument that his attorneys did not do enough to challenge his arrest appears to rest on his mistaken belief that his warrantless arrest was *per se* improper. This argument is unavailing for the reasons previously stated. Funk also believes that his attorneys should have challenged his arrest on the ground that at the probable cause hearing the following day, the officer did not mention that he was already in custody. (ECF No. 1, at 5). The Indiana Court of Appeals reasonably determined that this additional detail "would have been meaningless to any judicial officer making the probable cause determination." *Funk*, 2024 WL 2829583, at *5. The trial judge determined that there was probable cause to detain Funk based on the CODIS match and the other information linking him to a series of robberies carried out in a very similar manner. *Id.* The fact that Funk was already in custody did not make it any less likely that he had committed the robbery.

The record reflects Funk's attorneys were well aware of the facts surrounding his warrantless arrest, the probable cause hearing, and the other actions taken by police during the course of their investigation. They raised challenges to his arrest and to the evidence that they felt were warranted by the law. In their professional opinion, the argument Funk wanted them to make had no merit.[9] (ECF No. 9-17, at 70, 113–14). Funk has not shown that their strategic decision to

---

[9] The court notes that Funk faults counsel for not requesting a *Franks* hearing, but counsel did in fact request a *Franks* hearing on another issue and one was held. (ECF Nos. 9-2, at 28, 36, 47; 9-4, at 169). Funk has not shown that the

16

focus on other arguments amounted to incompetence, nor has he demonstrated a likelihood of a different result if they had raised the argument he points to.

In summary, the record reflects active and capable advocacy on the part of Funk's attorneys. Both attorneys had years of criminal defense experience, and Attorney Spencer also had 12 years of experience as a prosecutor. (ECF No. 9-17, at 113–14.) The attorneys both engaged in extensive pretrial preparations, and at trial Attorney Spencer tested the state's evidence through objections, cross-examinations, arguments, and the presentation of testimony on behalf of the defense. It appears that it was through Attorney Spencer's efforts that Funk was acquitted of one of the bank robbery charges. The alleged errors he cites do not amount to incompetence under prevailing professional norms, nor has he made the necessary showing of prejudice. He has not established an entitlement to federal habeas relief in connection with these claims.

Finally, Funk maintains that his rights were violated when the judge did not recuse himself in the post-conviction case. (ECF No. 1, at 7). The state court reasonably rejected this claim. *Funk*, 2024 WL 2829583, at *6. Funk's argument is a bit difficult to decipher, but in state court he argued that he was entitled to a change of judge under Indiana Post-Conviction Rule 4(b) because he wanted to challenge the warrants the judge had issued in his criminal case. (ECF No. 9-11, at 60, 233–34.) If Funk is arguing that the judge violated state law in failing to recuse, such a claim would not be cognizable on federal habeas review. *See Resendez*, 692 F.3d at 628.

For federal constitutional purposes, there is a presumption that a decisionmaker is unbiased. *Schweiker v. McClure*, 456 U.S. 188, 195–196 (1982). This presumption can be rebutted by showing the decisionmaker "displayed deep-seated and unequivocal antagonism that would render fair judgment impossible," *Liteky v. United States*, 510 U.S. 540, 556 (1994), or had a

---

issue he wanted counsel to pursue at a *Franks* hearing related to the fact that he was already in custody at the time of the probable cause hearing had any merit.

conflict of interest or some other reason for disqualification that was so extreme as to deprive the petitioner of fundamental fairness. *Schweiker*, 456 U.S. at 195–196. Funk has not shown that the post-conviction judge harbored an improper bias against him or had a conflict of interest that denied him fundamental fairness. Funk did actually litigate issues surrounding his attorneys' handling of the warrants, and the fact that the judge ruled against him does not amount to unconstitutional bias. *See Liteky*, 510 U.S. at 555. The judge also was not required to recuse simply because he presided over proceedings in Funk's criminal case. *Id.* Funk has not established an entitlement to federal habeas relief on this ground.

As a final matter, Funk moves for a stay of his petition. (ECF No. 20). He appears to invoke the stay and abeyance procedure outlined in *Rhines v. Weber*, 544 U.S. 269 (2005). A stay under *Rhines* is permitted in only "limited circumstances," because a stay "frustrates AEDPA's objective of encouraging finality by allowing a petitioner to delay the resolution of the federal proceedings," and "undermines AEDPA's goal of streamlining federal habeas proceedings by decreasing a petitioner's incentive to exhaust all his claims in state court prior to filing his federal petition." *Id.* at 27. *Rhines* applies to "mixed" petitions that contain both exhausted and unexhausted claims, however, and Funk does not have any unexhausted claims in his petition. Instead, his claims are not cognizable, procedurally defaulted, and without merit.

Funk appears to state that he wants to exhaust additional claims of ineffective assistance to supply cause to excuse his procedural defaults under *Martinez-Trevino*. (ECF No. 20, at 2–3). Under *Martinez-Trevino*, ineffective assistance by post-conviction counsel can supply cause to set aside the default of a claim of ineffective assistance of trial counsel. *Trevino v. Thaler*, 569 U.S. 413 (2013); *Martinez v. Ryan,* 566 U.S. 1 (2012). However, a habeas petitioner is not required to exhaust a claim of ineffective assistance by post-conviction counsel in order to use it as cause to

18

excuse a procedural default.[10] *See Karr*, 29 F.4th at 878–79. Furthermore, the Court has not denied any of Funk's claims on grounds of procedural default. Instead, the Court has also considered whether he is entitled to relief on the merits, concluding that he is not. A stay of the petition is not warranted under the facts of this case. The petition must be denied.

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, the Court must either issue or deny a certificate of appealability in all cases where it enters a final order adverse to the petitioner. To obtain a certificate of appealability, the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks and citation omitted).

For the reasons above, Funk's claims are not cognizable on federal habeas review, are procedurally defaulted, and/or are without merit under governing standards. The Court finds no reason to conclude that reasonable jurists could debate the Court's ruling or find a reason to encourage him to proceed further. Accordingly, the Court declines to issue a certificate of appealability.

### III. CONCLUSION

For these reasons, the petition (ECF No. 1) is DENIED and the petitioner's motion for a stay (ECF No. 20) is DENIED. The petitioner is DENIED a certificate of appealability. The clerk is DIRECTED to close this case.

---

[10] It is not apparent that *Martinez-Trevino* would apply to Funk, as his procedural defaults occurred at the post-conviction appeal level when he waived certain claims by failing to adequately develop them. *Martinez-Trevino*, by contrast, applies to errors that occur in the "initial-review collateral proceedings." *Martinez*, 566 U.S. at 16. It is unnecessary to consider this issue further since the petition is being resolved on other grounds.

SO ORDERED on November 3, 2025.

                                                s/ *Holly A. Brady*
                                                CHIEF JUDGE HOLLY A. BRADY
                                                UNITED STATES DISTRICT COURT